WILLIAMS, J.
hThe defendant, Eric Dale Mickel-son, was charged by a grand jury indictment with first degree murder, a violation of LSA-R.S. 14:30. A jury returned a unanimous verdict of guilty as charged and recommended the death penalty; the trial court formally sentenced the defendant to death. Following a direct appeal to the Louisiana Supreme Court, the defendant’s conviction and sentence were reversed and the matter was remanded to the trial court for a new trial. State v. Mickelson, 2012-2539 (La. 9/3/14), 149 So.3d 178 (“Mickelson I”).
On remand, a second trial by jury was held, and the defendant was found guilty as charged of first degree murder. Following the penalty phase of the trial, the jury recommended life imprisonment; the defendant was formally sentenced to serve life in prison at hard labor, without the benefit of parole, probation or suspension of sentence. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
On July 12, 2007, the victim, 86-year-old Charles Martin, was reported missing. A subsequent investigation led Shreveport police officers to the residence of Susan Glover, a/k/a Beverly Suzanne Arthur (“Arthur”). When officers arrived at the residence owned by Arthur’s mother, they observed the victim’s vehicle in the driveway and the defendant, Eric Dale Mickel-son, standing in the front yard. A search of the defendant’s person revealed that he was in possession of the victim’s wallet and driver’s license. Arthur’s mother granted permission to search the residence. During the search, the officers found some coins that had been taken from the victim’s 12home and a portion of a check bearing the victim’s signature. Arthur and the defendant were transported to the police station.
In a statement to law enforcement officers, Arthur related that the defendant had killed the victim, dismembered his body and disposed of the body parts in more than one location. Arthur was unable to lead the officers to the location(s) of the remains of the victim. However, she stated that she and the defendant had gone to some property owned by the defendant’s family.[1]
In his statement to law enforcement officers, the defendant admitted that he broke into the victim’s home, killed the victim and stole several items from the home to fund his cocaine addiction. Further, the defendant stated that he and Arthur had taken the victim’s body to some property owned by his family, dismembered the body and disposed of the remains in several different locations. The defendant led officers to four separate locations where various parts of the victim’s body were recovered.
*896 A Caddo Parish grand jury returned an indictment charging the defendant with first degree murder. Following a trial, the jury returned a unanimous verdict, finding the defendant guilty as charged of first degree murder. Following the penalty phase of the trial, the jury recommended the death penalty; the trial court formally sentenced the defendant to death. Following a direct appeal, the Supreme Court found that the trial court had committed reversible error in denying the defendant’s challenge for cause with regard to a prospective juror. The Court reversed the defendant’s | ¡¡conviction and sentence, and remanded this matter for a new trial.

Mickelson I, supra.

Following a new trial, the defendant was again found guilty as charged of first degree murder. After the penalty phase of the trial, the jury recommended a life sentence, Consequently, the defendant was sentenced to serve life imprisonment at hard labor, without the benefit of parole, probation or suspension of sentence.
The defendant now appeals.
DISCUSSION
The defendant contends the trial court erred in denying his challenges for cause with regard to ten prospective jurors. He argues that he exhausted all of his peremptory challenges; therefore, prejudice is presumed. More specifically, the defendant argues that the trial court erred in denying his challenges for cause with regard to the following prospective jurors: Tamika Atkins, Dameoyn Woodley, Alexis Sarkozi, Belinda Moentman, Stephen Smith, Tumekia Wilson, Smitty Brown, Louis Guiden and Michelle Wilson. The defendant makes a “reverse-Wi/Aer-spoon”[2] complaint, arguing that because Atkins, Woodley, Sarkozi, Moentmann, Smith, Michelle Wilson and Guiden “indicated an inability to consider mitigation or a life sentence,” the challenge for cause should have been granted. The defendant also argues that Tumekia Wilson and Smitty Brown stated that “dismemberment [was] a reason to impose the death penalty”; therefore, his challenge for cause also should have been granted as to those prospective jurors.
In State v. Dunn, 2001-1635 (La. 11/1/02), 831 So.2d 862, our Supreme Coui’t explained Witherspoon and reverse-Wiffe-erspoon complaints as follows:
The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror’s views would ‘prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.’ [I]n a ‘reverse-Witherspoon’ context, the basis of the exclusion is that the juror ‘will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him[,]’ If a prospective juror’s inclination toward the death penalty would substantially impair the performance of the juror’s duties, a challenge for cause is warranted.
Id., at 927 (internal citations omitted).
However, the Court has consistently held that where the jury did not recommend the death penalty, the defendant is insulated from the death penalty, and there is, therefore, no valid Witherspoon complaint. State v. Edwards, 406 So.2d 1331 (La. 1981), cert. denied, 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982); State v. George, 371 So.2d 762 (La. 1979); State v. Turner, 37,162 (La.App. 2 Cir. *897 10/29/03), 859 So.2d 911, writ denied, 2003-3400 (La. 3/26/04), 871 So.2d 347.
In the instant case, the jury recommended life imprisonment at hard labor, without the benefit of parole, probation or suspension of sentence. Therefore, the defendant has no valid Witherspoon or reverse-Witherspoon complaint. This assignment lacks merit.
The defendant also challenged for cause prospective juror Donna Crane. During her initial voir dire, Crane stated that she would consider all of the mitigating circumstances, however, she “would like to hear [the defendant’s] side” prior to voting to impose a sentence. Thereafter, defense | ^counsel explained that the defendant was not required to present any evidence at either phase of the trial. Crane replied, “I’d think you’d want to present your side of the story[.]” Thereafter, the trial court provided the following instruction to the panel of prospective jurors:
In my initial instructions, I informed you that—and I want to remind you of this, and everyone, the defendant starts this with a clean slate, and the Defense doesn’t have to do anything. They don’t have to call any witnesses, they don’t have to put on any evidence, they have no burden of proof. The entire burden is on the State to prove beyond a reasonable doubt in both phases of a first degree murder trial.
The defendant challenged Crane for cause, stating, “I believe she is shifting the burden [t]o require the Defense to put on evidence, where that’s not required by law.” Crane was called for individual voir dire, and the following exchange occurred: ⅜ ⅜ ⅜
[State]: I think the Court has instructed you that the Defense has no legal duty to put on any evidence anytime.
[Crane]: Right.
[State]: Would you accept that as the law?
[Crane]: Yes, sir.
⅜ ⅜ ⅜ ‡
[Defense Counsel]: [I]f the Defense were to put on no evidence at a penalty phase[,] at that point ... would you impose a death sentence because the Defense presented no mitigating evidence, because you found the person guilty of first degree [murder]?
[Crane]: No, ma’am.
[Defense Counsel]: Would you hold it against the Defense if they didn’t put on mitigation?
[Crane]: No, ma’am.
* ⅜ *
|fiThe defendant continued to challenge Crane for cause, stating, “[T]here was a huge hesitation when she was asked the question. I don’t think it’s clear that she would not shift the burden. I mean, there was probably a ten second, twelve second hesitation when she was asked that question.” The trial court denied the challenge for cause, stating:
I do agree there was hesitation. I didn’t count the number of seconds, but I wrote, would you require the Defense to put on any mitigation evidence, and hesitated, she said, not necessarily.
But in response to your questions, there was no hesitation, and your questions were more pointed. If the Defendant puts on zero evidence, and you did your whole first degree murder, no legal defenses[,] would you impose the death penalty because they put on no mitigation.
She immediately said no. In fact, [she] interrupted you before you were through asking the question. She said, no.
Would you hold it against the Defense if no mitigation evidence was presented?
*898 And she said, no, ma’am. Her hesitation may have something to do with the fact that she’s exhausted because it’s 7:15 p.m., and she’s been here since 1:15. So, I’m not going to grant the challenge for cause for Ms. Crane.
* * *
A trial court is vested with broad discretion in ruling on challenges for cause and its rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Tucker, 2013-1681 (La. 9/1/15), 181 So.3d 590; State v. Odenbaugh, 2010-0268 (La. 12/6/11), 82 So.3d 215. A court’s evaluation of the attributes required to qualify a prospective juror is entitled to great weight. Therefore, the court’s exercise of the wide discretion that determination requires will not be set aside unless it is arbitrary and unreasonable. State v. Webb, 364 So.2d 984 (La. 1978).
|7A prospective juror’s responses during voir dire cannot be considered in isolation. A challenge for cause should be granted, even when a prospective juror has declared his or her ability to remain impartial, if the juror’s responses, as a whole, reveal facts from which bias, prejudice or inability to render a judgment according to the law may be reasonably inferred. Mickelson I, supra; State v. Frost, 97-1771 (La. 12/1/98), 727 So.2d 417; State v. Hallal, 557 So.2d 1388 (La. 1990). Nevertheless, a refusal to disqualify a prospective juror on grounds that he or she is biased will not constitute reversible error or an abuse of discretion if, after further inquiry or instruction (frequently referred to as “rehabilitation”), the prospective juror demonstrates a willingness and ability to decide the case according to the law and the evidence. Mickelson I, supra; State v. Jacobs, 99-1659 (La. 6/29/01), 789 So.2d 1280.
We find no error in the trial court’s denial of the challenge for cause with regard to Crane. The record reveals that, once the relevant law was explained to her, she expressed her understanding that the defendant was not required to present any evidence during either phase of the trial. Thereafter, Crane indicated that she would follow the law and that she would not hold it against the defendant if he did not present evidence during the guilt or penalty phase. Therefore, we find that the defendant failed to prove that Crane was not impartial or that she would not accept the law as given to her by the trial court. This assignment is without merit.

Motion to Change Plea

The defendant contends the trial court erred in denying his request to change his plea from “not guilty” to “not guilty and not guilty by reason of insanity.” He argues that he made a showing of mental illness and changing Rhis plea would not have delayed the proceedings. The defendant also argues that the trial court erred in concluding that the motion to change his plea was merely a delay tactic. Further, the defendant asserts that the trial court “invaded the province of the jury” because the determination of whether a defendant knew right from wrong at the time of the offense lies solely with the jury.
A defendant may withdraw a plea of “not guilty” and enter a plea of “not guilty and not guilty by reason of insanity,” within 10 days after arraignment. LSA-C.Cr.P. art. 561. When the change of plea is sought after the 10-day period, the defendant must show that good cause exists to justify the change in plea and that the motion is not a dilatory tactic to achieve a strategic advantage. State v. Miller, 2005-1826 (La. 6/29/07), 964 So.2d 911; State v. Mercer, 564 So.2d 783 (La. App. 2d Cir. 1990). To demonstrate “good *899 cause,” the defendant must produce some “indicia of insanity,” or some evidentiary basis to warrant the change. State v. Miller, supra; State v. Simmons, 2013-258 (La.App. 5th Cir. 2/26/14), 136 So.3d 358, writ denied, 2014-0674 (La. 10/31/14), 152 So.3d 151.
LSA-C.Cr.P. art. 561 does not require the defendant who moves to change his plea to show that he can prove his insanity defense at trial, as that is a factual question to be determined by the finder of fact at trial. State v. Miller, supra; State v. Mercer, supra. A defendant is permitted to change his plea as long as a non-frivolous insanity defense exists. State v. Miller, supra. Once the 10-day time period expires, the defendant may file a motion to change his plea at any time prior to the commencement of trial. However, the defendant’s burden of showing good cause for a change of plea increases 13each day that his trial date nears. State v. Miller, supra; State v. Mercer, supra.
In the instant case, the defendant waived arraignment and entered a plea of “not guilty” on September 7, 2007. Thereafter, the defendant was tried and convicted, the conviction and sentence were reversed, and the matter was remanded. Following remand and numerous motions and delays—including a number of motions for continuances—the defendant filed the motion to withdraw his plea of “not guilty” and enter a plea of “not guilty and not guilty by reason of insanity” on September 11, 2015 (34 days before the new trial was scheduled to commence). Here, the defendant must show that good cause exists to justify the change in plea and that the motion is not a dilatory tactic to achieve a strategic advantage.
Following a hearing, the trial court denied the defendant’s motion to change his plea, finding that the defendant had failed to establish that he had good cause to change his plea. The court also found that the defendant’s motion to change his plea was a dilatory tactic. The court stated:
In the present case, defense counsel has only provided the Court with medical testimony given at Defendant’s original trial. They have not provided any evidence demonstrating [the defendant] has a history of mental illness or, for that matter, has ever been diagnosed with a particular mental disease. Although defense keeps referring to additional medical evidence regarding [the defendant’s] mental state, they have failed to provide it.
[[Image here]]
Defendant was arrested in 2007 and convicted in 2011. Defense has had ample time to collect and present new evidence to the Court; however, they have failed to do so. This failure to present new evidence leads to the second distinguishing factor: the defense appears to be using this Motion as a dilatory tactic. ⅜ ⅜ ⅜
[D]efendant is being retried for First Degree Murder. Defense could have brought the Motion to Change Plea in his original |intrial. Defense could have brought the Motion along with the approximately 155 other motions they have filed since Defendant’s conviction was reversed and remanded. This did not occur. Instead, Defendant waited until one month before his second trial, notably after their motion for a continuance was denied, to file this Motion.
The Court concludes that Defendant lacks good cause to change his plea. The evidence provided by defense fails to provide some evidentiary basis for the insanity plea. Namely, defense has failed to provide any evidence to contradict a statement by their own witness, Dr. Ag-harkar, stating that the mental health *900 defense will not work. Finally, based on the conduct of the defense, it appears that this Motion is a dilatory tactic intended to force the State into requesting a continuance after defense’s own motion for a continuance was denied.
* * [3]
In State v. Taylor, 254 La. 1051, 229 So.2d 95 (1970), the coroner, who was not a psychiatrist, testified that, at the time of the offense, the defendant had schizophrenia, was experiencing a psychotic episode and did not have insight into what was happening at the time of the offense. Additionally, the sheriff testified that the defendant’s former cellmate had reported that the defendant was “having delusions.” The Louisiana Supreme Court found that the trial court erred in denying the defendant’s motion to change his plea to not guilty and not guilty by reason of insanity. The Court reversed the defendant’s conviction and remanded the matter for a new trial.
In State v. Delpit, 341 So.2d 876 (La. 1977), the evidence showed that the defendant functioned at the “lower end of the scale for mental retardation,” had received psychiatric treatment as a child and was currently undergoing psychiatric treatment. The Court held that the supporting 1 ^documentation, in addition to the defendant’s current psychiatric treatment, was sufficient to justify the change in plea.
In State v. Miller, supra, the defendant presented evidence that he had undergone psychiatric treatment from the age of five years old to 14 years-old. Also, the defendant’s mother testified that he had “behavior problems” and that he had attempted suicide on three occasions. Further, months before he committed the quadruple homicide, the defendant had been committed to a mental institution for medical management of a depressive illness and psychosis. Additionally, a psychiatrist testified that after the defendant committed the offenses, he experienced hallucinations. The Supreme Court found that the trial court erred in denying the defendant’s motion to change his plea to not guilty and not guilty by reason of insanity.
In State v. Mercer, supra, the defendant had been diagnosed with manic depressive disorder, for which he was taking medication at the time of the offense, and he had a history of admissions to mental health facilities. This Court found that the trial court erred in denying the defendant’s motion to change his plea to not guilty and not guilty by reason of insanity.
In the case at hand, as the trial court noted, this record is devoid of any evidence that the defendant was ever diagnosed with or received treatment for any mental illness. In support of his motion to change his plea, the defendant presented the prior testimony of Dr. Craig Beaver, a neurop-sychologist, and Dr. Shawn Agharkar, a forensic psychiatrist, both of whom testified during the penalty phase of the defendant’s first trial. Both Dr. Beaver and Dr. Agharkar testified that, prior to the defendant’s first trial, they met with him twice and reviewed his medical records. They testified that the defendant had schizoaf-fective disorder, basing their opinions on 112their observations that, during their interviews, the defendant had severe difficulties with inattention and lack of focus, inhibited impulse control, disorganization of thoughts and illogical thought processes. Additionally, Drs. Beaver and Agharkar testified that the defendant’s cocaine use enhanced his mental health issues, causing poor decision-making and the inability to appreciate consequences. Dr. Beaver testi *901 fied that he “could not say” that the defendant did not know right from wrong at the time of the offense. However, Dr. Aghar-kar unequivocally testified that the defendant “knew right from wrong at the time of the crime” and stated that he had informed defense counsel that the defendant did not have a viable “mental health defense.”
As stated above, the defendant’s expert witnesses testified in 2011, during the penalty phase of his first trial. Unlike the defendants in the above-cited cases, this record is devoid of any evidence that this defendant had a history of mental illness or any mental health treatment prior to the commission of the offense. Although the defendant has been incarcerated for approximately nine years, and has been evaluated by mental health professionals, there is no evidence that he has ever undergone, or is currently undergoing, any treatment for any mental illness or defect. Dr. Agharkar testified that he had spoken to various members of the defendant’s family. However, none of the family members stated that the defendant had ever been diagnosed with any mental, emotional or behavioral problems or that he had ever experienced difficulty discerning right from wrong, either as a child or as an adult. Most of their statements indicated that the defendant exhibited “strange” or “odd” behaviors and beliefs and that his thought process was “different from most other people.”
| ^Further, in the defendant’s statement to the police officers, he admitted that he had ingested crack cocaine prior to entering the victim’s home and made repeated references to being “high” at the time of the murder. He admitted that he strangled the victim because Arthur asked him to do so. The defendant asserted intoxication as a mitigating circumstance during the penalty phase. However, the defendant did not assert insanity as an affirmative defense and he did not assert that, due to a mental illness or mental defect, he did not know right from wrong at the time ,of the offense.[4]
Our review of the record shows that the defendant presented evidence of intoxication. However, the defendant failed to show “an indicia of insanity” at the time of the offense. In fact, the defendant’s own expert testified that the defendant “knew right from wrong at the time of the crime[J” Absent documented history of mental health treatment—which the courts have historically relied upon in reversing decisions denying motions to change a plea to “not guilty and not guilty by reason of insanity”—we find that the trial court did not abuse its discretion in denying the defendant’s motion to change his plea. This assignment lacks merit.

Motion to Exclude Photographs

The defendant contends the trial court abused its discretion in denying his motion to exclude certain photographs from evidence. He argues that the court allowed the state to introduce into evidence “repetitive, prejudicial and 114gruesome” photographs. He asserts that the probative value of the photographs is significantly outweighed by their prejudicial effect. Specifically, he argues that the autopsy photographs, as a whole, were *902 particularly horrific and that their “gruesomeness” was magnified by the state’s decision to enlarge them. Further, the defendant argues that the introduction of crime scene photographs was unnecessary, in light of the trial testimony and the autopsy photographs.
Photographs are generally admissible if they illustrate any fact, shed any light upon an issue in the case, or are relevant to describe the person, thing or place depicted. State v. Magee, 2011-0574 (La. 9/28/12), 103 So.3d 285; State v. Sepulvado, 93-2692 (La. 4/8/96), 672 So.2d 158. A trial court’s ruling with respect to the admissibility of photographs will not be overturned unless it is clear the prejudicial effect of the evidence outweighs its probative value. LSA-C.E. art. 403; State v. Magee, supra; State v. Maxie, 93-2158 (La. 4/10/95), 653 So.2d 526.
Even when the cause of death is undisputed, the state is entitled to the moral force of its evidence, and post-mor-tem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as location and placement of wounds and to provide positive identification of the victim. State v. Magee, supra. Photographic evidence will be admitted unless it is so gruesome as to overwhelm jurors’ reason and lead them to convict without sufficient other evidence. Id.
In this case, the defendant filed a pleading entitled “Motion to Exclude Gruesome Photographs and Prohibit State From Displaying Them Enlarged and Projected on the Entire Wall in Front of the Jury.” The 11Bdefendant sought to prohibit the state from introducing into evidence the same photographs—some of which were enlarged and projected onto the wall—that were used at the defendant’s first trial. More specifically, the defendant argued as follows: eight of the photographs showed the victim’s “naked, bloodied torso[,] ragged flesh ... hang[ing] from gaping holes at the arm socket and neck [and] a bloodied head, black with decay”; 29 photographs documented “body parts at autopsy”; four photographs were “close-ups of scrapes on decayed skin”; one photograph “showed tool marks that matched a blade in evidence; and the “decaying torso and head with its mouth gaping open.” In the alternative, the defendant argued that the photographs should only be presented “in black and white to reduce the gruesomeness of the pictures that will overwhelm the jurors[.]”[5]
The record reveals that the state and defense counsel agreed to review the photographs and provide written memoranda to the trial court regarding the motion to exclude the photographs. The photographs were submitted to the trial court for an in camera inspection. Subsequently, the state agreed to exclude 21 photographs and objected to the exclusion of 26 other complained of photographs. The trial court reviewed the memoranda prepared by counsel and performed an in camera inspection of the photographs. Thereafter, the court denied the defendant’s motion to exclude the remaining photographs, stating:
I will state for the record that this is a first degree murder case. I would be hard pressed to say the pictures aren’t gruesome. I don’t know of any murder case where the pictures aren’t gruesome[.]
| tfiThe record reveals that the state received a large number of photographs of *903 the deceased victim from the police department and the coroner’s office. Multiple photographs included various parts of the victim’s dismembered body, some of which were taken from various angles. Twenty-six photographs admitted into evidence reflect the injuries the victim suffered and the condition and location of those injuries on the body. Additionally, in an effort to demonstrate that the victim did not die of natural causes, the state introduced into evidence photographs of the coroner holding various organs belonging to the victim.
We find that the trial court did not abuse its discretion in denying the defendant’s motion to exclude the photographs. The court examined each photograph and concluded that the photographs were admissible. Although the photographs were gruesome, we recognize that the murder and dismemberment of the victim’s body were, in fact, grisly acts. The law is well-settled: the admission of gruesome photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect. State v. Broaden, 99-2124 (La. 2/21/01), 780 So.2d 349; State v. Martin, 93-0285 (La. 10/17/94), 645 So.2d 190. The state is entitled to the moral force of its evidence, even when the cause of death is undisputed. We find that the defendant failed to show that the prejudicial effect of the photographs substantially outweighed their probative value. This assignment lacks merit.
CONCLUSION
For the reasons set forth herein, the defendant’s conviction and sentence are hereby affirmed.
CONVICTION AFFIRMED; SENTENCE AFFIRMED.

. On April 29, 2013, Arthur pled guilty to second degree murder. She was sentenced to serve life imprisonment at hard labor, without the benefit of parole, probation or suspension of sentence.

. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

. The defendant sought supervisory review of the trial court's denial of the motion to change his plea, which this Court denied on October 15, 2015.

. We note that the defendant had filed a "Motion to Preclude the Death Penalty Due to Mental Illness" and a pleading entitled "Motion to Bar the Death Penalty Because of the Unacceptable Risk that Mr. Mickelson’s Severe Mental Illness Will Not Be Reliably Considered If His Case Reaches the Penalty Phase, and That the Jury’s Verdict Will Not Be a Reasoned Moral Response." However, the defendant did not attempt to change his plea to "not guilty and not guilty by reason of insanity" until after the trial court denied his last motion for a continuance during his new trial.

. Counsel for the defendant conceded that they had not actually viewed the photographs. They stated that they were relying upon the record from the defendant’s first trial to determine what was depicted in each photograph.